PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3418
_____

IN RE: TIFFANY D. SMITH,
                                        Debtor

FREEDOM MORTGAGE CORPORATION,
                                        Appellant
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. No. 2-21-cv-11025)
District Judge:  Honorable Evelyn Padin
Bankruptcy Judge:  Honorable John K. Sherwood
_____

Argued
September 13, 2023

Before:   JORDAN, BIBAS, and PORTER, Circuit Judges

(Filed  May 22, 2024)
_____

William M. E. Powers, III   [ARGUED]
Powers Kirn
308 Harper Drive
Suite 210
Moorestown, NJ  08057
        *Counsel for Appellant*

Kevin De Lyon   [ARGUED]
Herbert B. Raymond
Raymond and Raymond
7 Glenwood Avenue
Suite 408
East Orange, NJ  07017
        *Counsel for Debtor-Appellee*

Marie Ann Greenberg
30 Two Bridges Road
Fairfield, NJ  07052
        *Trustee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Before a court will consider a creditor's objections to a bankruptcy plan, the creditor must be timely in the objections. Freedom Mortgage Corporation ("Freedom") did not object to certain terms in early versions of Tiffany Smith's bankruptcy plan, but it now challenges those same terms in her third modified plan.  Most of the objections are too late and are foreclosed by res judicata.   The only objection not so

2

foreclosed bears on the feasibility of the plan, but the Bankruptcy Court did not clearly err in finding that Smith's third modified plan was feasible. Consequently, we will affirm the District Court's affirmance of the Bankruptcy Court's order confirming the bankruptcy plan.

## I.    BACKGROUND

In May of 2019, Smith filed a voluntary petition for a Chapter 13 bankruptcy proceeding in the United States Bankruptcy Court for the District of New Jersey.[1]  In addition to her day-to-day employment as a product manager, she owns a two-unit rental property in Newark, New Jersey (the "Property").  The Property is secured by a mortgage held by Freedom.  That mortgage contains an "absolute assignment" of rents provision whereby Smith agreed to "unconditionally assign[] and transfer[] to [Freedom] all the rents and revenues of the Property."  (App. at 94.)

### A.    The First Modified Plan

Smith filed a Chapter 13 payment plan in the Bankruptcy Court, as required by the Bankruptcy Code.[2]  11

---

[1]  Chapter 13 of the Bankruptcy Code is entitled "Adjustment of Debts of an Individual with Regular Income[.]"  11 U.S.C. §§ 1301-1330.  It "offers the possibility of relief to individual debtors who have some capacity to make payments on their debts."  *In re Klaas*, 858 F.3d 820, 823 (3d Cir. 2017).

[2]  "After filing a voluntary petition for relief, a Chapter 13 debtor must propose a plan that provides for the payment of future earnings to cover claims on the debtor's estate."  *Klaas*,

3

U.S.C. § 1321.[3]  Freedom then filed a secured proof of claim for its mortgage on the Property in the amount of $242,906.[4] Before the Bankruptcy Court ruled on Smith's proposed plan, she petitioned the Bankruptcy Court to accept a different plan (the "First Modified Plan").  The First Modified Plan included a motion to partially void Freedom's mortgage lien on the Property and to reclassify Freedom's underlying claim as partially secured and partially unsecured.  Specifically, Smith requested that the collateral value of the Property, which she listed as $95,000, plus interest, be deemed the secured amount of Freedom's claim and that the remainder of its claim be reclassified as unsecured.    Approximately $150,000 of Freedom's claim would be transformed from secured to unsecured under the terms of Smith's First Modified Plan.[5]  In

---

858 F.3d at 823 (internal quotation marks omitted).  The proposed plan is subject to the Bankruptcy Court's approval. 11 U.S.C. § 1325(a)(1).  The details of Smith's original bankruptcy plan are not before us.

[3]  Unless otherwise indicated, all further section references in this opinion are to the Bankruptcy Code, as amended, 11 U.S.C. § 101 et seq.

[4] Amounts stated here are rounded to the nearest dollar. Smith was $72,647 in arrears on the payments associated with her mortgage at the time of her petition.

[5]  The total amount Smith owed to Freedom had increased to $255,303 by the time Smith filed her First Modified Plan.

bankruptcy parlance, such a reclassification is known as a "cramdown."[6]

The First Modified Plan noted that Smith had paid $8,200 over four months through September of 2019 and proposed that Smith would pay the bankruptcy trustee $450 per month over the remaining 56 months of the 60-month plan.[7] The First Modified Plan also called for the Property's rental income of $1,600 per month to be remitted directly to Freedom and that such income would reduce the amount of Freedom's crammed-down secured claim.[8]

---

[6] In a cramdown, the bankruptcy judge "determines the market value of the collateral," and then "[t]he creditor's claim is treated as a secured claim to the extent of that value." *In re Howard*, 597 F.3d 852, 854 (7th Cir. 2010). "If the value is less than the unpaid balance of the secured loan, the difference is demoted to being an unsecured claim of the creditor." *Id.* This demotion "forc[es] the secured creditor to accept less than the full value of its claim and thereby allow[s] the plan to be 'crammed down the throats of objecting creditors.'" *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010), *as amended* (May 7, 2010) (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir. 1990) (Easterbrook, J.)).

[7] Section 1322(d) limits the duration of a Chapter 13 bankruptcy plan to a maximum of five years.

[8] Under the First Modified Plan, Smith would also pay all costs and expenses related to the Property.

Freedom objected to the First Modified Plan. In particular, it protested the cramdown of its secured claim, the Property's listed valuation of $95,000, the Property's rents being applied to reduce its secured claim, and the feasibility of the overall plan. The Bankruptcy Court held a hearing in November of 2019 to address Freedom's objections. At the hearing, Freedom clarified that it was not, in fact, disputing the listed value of the Property. To confirm its understanding of Freedom's assertion, the Bankruptcy Court asked, "You're okay with ninety-five [thousand] [a]s the value[?]" (App. at 202.) Freedom responded: "Correct." (App. at 202.)

Later in the hearing, the Bankruptcy Court explained that "the big issue" was how the Property's rents were to be applied: whether Freedom was required to use the rents received to reduce its secured claim, or if it could apply them "towards [its] unsecured claim and retain [its] entire secured claim in full." (App. at 210.) The parties characterized that issue as the "*Jason Realty* [] issue," naming it after a case that similarly involved an absolute assignment provision in a bankruptcy proceeding. (App. at 199 (emphasis added).) In *In re Jason Realty, L.P.*, we held that the rents at issue were "unavailable for use, allocation or utilization" in the debtor's proposed bankruptcy plan. 59 F.3d 423, 431 (3d Cir. 1995).

During the hearing, the parties disputed whether *In re Jason Realty*'s holding prohibited the Bankruptcy Court from requiring Freedom to use the rents it would receive from the Property to reduce its secured claim. The Court stated that it did not believe *In re Jason Realty* prohibited the rents from being used to reduce the secured claim. Freedom's counsel asked the Bankruptcy Court, "So the rent payment would go to pay down the $95,000 plus interest over the 55 months, that

6

payment will pay … down that amount, correct?" (App. at 216-17.) The Court answered, "Yes," and explained that Smith would still be responsible to reimburse Freedom for any carrying costs it had incurred on the Property. (App. at 217.) Freedom's counsel responded, "That's fine. Then I will discuss that with my client on that issue, okay. Let them know where the Court is going in its decision process." (App. at 217.) Subsequently, the Bankruptcy Court issued an order enforcing the assignment of the Property's rents to Freedom, but otherwise stayed relief, giving the parties time to resolve Freedom's other objections to the plan.[9]

Shortly after the November hearing, the parties resolved their differences and filed a consent order (the "Consent Order"). In that Consent Order, the parties agreed, in relevant part, to the following terms:

> a. The Property has a fair market value of $95,000. As such, Freedom's secured lien on the Property shall be reduced to $95,000. … The remaining [amount] shall be treated as an unsecured claim and paid out with the unsecured creditors.
>
> …
>
> d. The Parties agree that the total amount the Debtor is to pay towards the cram down amount

---

[9] The order following the November hearing prohibited Smith from using the Property's rents and required her to turn them over to Freedom.

7

… will be … [the] $95,000.00 Crammed Down Value + … interest and … post-petition escrow.

…

f. The Parties agree that all rental payments that are held by the Debtor or Debtor's counsel shall be immediately paid to the Chapter 13 Trustee. On a go forward basis, the Debtor shall tender all rental payments to the Chapter 13 Trustee.

(App. at 120-21.)  Thus, Freedom's claim on the Property was bifurcated into a secured claim of $95,000, plus interest, and an unsecured claim for the remaining amount.  Additionally, the rental payments would go to the bankruptcy trustee, rather than directly to Freedom, to be used to pay off the crammed-down secured claim.  The parties agreed that the Consent Order would "be incorporated into and become part of any Order Confirming Plan[.]"  (App. at 122.)  In January of 2020, the Bankruptcy Court confirmed the First Modified Plan, which reflected the terms of the Consent Order.

## B.     The Second Modified Plan

Shortly after the inception of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which, among other things, added a temporary provision to the Bankruptcy Code that allowed Chapter 13 debtors to extend the duration of their bankruptcy plans up to 84 months, two years longer than the normal 60-month maximum, if "the debtor [was] experiencing or ha[d] experienced a material financial hardship" because of the COVID-19 pandemic.  § 1329(d) (repealed 2022); Pub. L. No. 116-136, 134 Stat. 281, 312 (2020).  To take advantage of that provision, Smith filed another modified plan (the "Second

8

Modified Plan") in June of 2020, seeking a six-month extension of her plan. Notably, Smith's Second Modified Plan called for a stepped-up payment component, proposing payment of $1,500 per month for six months, and then for payment of $2,440 per month for the remaining 47 months of the plan.[10] Except for the revised payment plan, the terms of the Second Modified Plan mirrored the terms of the First Modified Plan.

Freedom did not object to the Second Modified Plan, and the Bankruptcy Court confirmed it in July of 2020, stating that "it appear[ed] that the applicable provisions of the Bankruptcy Code have been complied with[.]" (Supp. App. at 26.)

### C.    The Third Modified Plan

In December of 2020, Smith filed a third modified plan (the "Third Modified Plan"), the one at issue here. She again sought to extend the payment term – this time to the CARES Act statutory maximum of 84 months – because she had delinquent tenants, and she could not evict them due to pandemic-related eviction moratoriums. The Third Modified Plan maintained the $95,000 cramdown value and called for stepped-up monthly payments of $1,500 per month for eight

---

[10] Smith explained in her certification to the Second Modified Plan that COVID-19 had caused her tenants to be behind in their rental payments and that the six-month plan extension, with a reduction in payment on the front end, would accommodate the decrease in rent receipts.

9

months and then $2,010 per month for the remaining fifty-seven months.

Freedom objected to the Third Modified Plan. It argued, among other things, that (1) the use of rental income to pay the secured claim was foreclosed by *In re Jason Realty*; (2) the plan's stepped-up monthly payments violated § 1325(a)(5)(B)(iii)(I); (3) the Property's cramdown valuation was too low and thus violated § 1325(a)(5)(B)(ii), and (4) the plan was not feasible.

The Bankruptcy Court held a hearing in March of 2021 to consider Freedom's objections to the Third Modified Plan. At the hearing, the Bankruptcy Court questioned Freedom about why it was challenging the use of rental income to pay off its secured claim when it had consented to that arrangement previously: "[I]n January of 2020, a little over a year ago, [Freedom] was okay with using the rents to apply against plan payments. They consented to it. And … now you're saying you don't want to do that anymore[?]" (App. at 241.) In response, Freedom argued that the Third Modified Plan was "a new plan" to which it had not consented, stating that "[t]here was nothing in [the Consent Order] that required the creditor to consent to future plans, different plans." (App. at 241.) It also asserted that the Property's value needed to be redetermined. The Bankruptcy Court was not convinced by Freedom's arguments:

> But it's really not a whole new plan for you. You're still getting the present value of $95,000 that you agreed to initially. … [W]hat's troubling me is, you know we had this Covid situation and Congress has come down and provided some

10

legislation that is relief for debtors. And … here you have a debtor who is trying to take advantage of that provision by extending her plan out two years and all of a sudden the bank doesn't like the deal that it did way back when and it's using this as an opportunity to, you know renegotiate or void previous agreed to terms.

(App. at 256.) Regardless, the Court reserved decision on the Third Modified Plan.[11]

A confirmation hearing was held the following month. The Bankruptcy Court held that "the issues of value, the use of the rents [to pay down the secured claim,] and the step up in payments [were] res judicata" because of the Consent Order and Smith's Second Modified Plan. (App. at 11.) It then examined the plan's feasibility. After analyzing Smith's financial schedules, the Court found that Smith had sufficient income, after subtracting expenses, to make the payments proposed in the Third Modified Plan. The Court also received confirmation from the bankruptcy trustee that Smith was up to date on her obligations in the bankruptcy proceeding. The Court acknowledged that Smith might have difficulty making the payments, saying "it's going to be really close once the step up [in payment] occurs to [$]2,010 per month[.]" (App. at 11.)

---

[11] During the March 2021 hearing, the parties also disputed issues regarding Smith's delinquency in paying property taxes and whether she needed to reimburse Freedom for certain insurance premiums. The Bankruptcy Court resolved those issues in a written order following the hearing, and they are not relevant to this appeal.

11

It also questioned, "who knows what's going to happen with the rent[?]" referring to the uncertainty of whether Smith would receive rent from her tenants. (App. at 12.) Nevertheless, the Court summarized why it would be confirming the Third Modified Plan:

> I don't think anyone has a crystal ball, all we can do is project. Certainly, there is a hope and expectation that things might get back to some normalcy soon. I have no idea when the eviction moratorium is going to be lifted but I do know that people are getting back to work.
>
> …
>
> I didn't do the math, but at the end of the day, [Freedom] is going to get [$]95,000 plus interest at the percentage that was bargained for and was going to get reimbursed for anything it went out of pocket for and would be adequately protected going forward by the payment of taxes and insurance. That was the deal that was approved and bargained for and then approved again last summer[,] … the President extended the CARES Act[,] … the debtor wants more time because Covid has gone on longer than anticipated[,] and the law gives the debtor the right to seek more time[.] … So for those reasons, I'm inclined to confirm the amended plan.

(App. at 13-14.)

The Bankruptcy Court then confirmed the Third Modified Plan in a written order, stating that it "considered the

objection filed by [Freedom] … and for reasons stated on the record at the … confirmation hearing[,] creditor's objection is overruled[,]" and it again noted that "it appear[ed] that the applicable provisions of the Bankruptcy Code have been complied with[.]" (App. at 194.)

Freedom appealed the Bankruptcy Court's order to the District Court, which affirmed it, holding that all of the issues that Freedom raised, including feasibility, were precluded by res judicata.[12] Freedom has now timely appealed to us.

## II.   DISCUSSION[13]

Freedom argues that, for five reasons, the District Court erred in affirming the Bankruptcy Court's confirmation of the

---

[12] Notwithstanding the District Court's holding that Freedom's feasibility argument was precluded by res judicata, the Court stated in a footnote, without analysis, that "[t]he feasibility issue … was properly determined in [Smith]'s favor during the First, Second, and Third Modified Plan confirmations." (App. at 37 n.13.)

[13] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The District Court had jurisdiction to review the Bankruptcy Court's decision under 28 U.S.C. § 158(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1). We "'stand in the shoes' of the District Court and ... review the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc) (citations omitted).

13

Third Modified Plan: (1) the District Court incorrectly applied res judicata, (2) the Third Modified Plan unlawfully allowed Smith to use the Property's rental income to pay the secured claim, (3) the cramdown value of the Property must be updated to its current value, rather than the $95,000 value specified in Smith's previously confirmed bankruptcy plans, (4) the Third Modified Plan violated the Bankruptcy Code by calling for unequal monthly payments, and (5) the Third Modified Plan is not feasible.

We agree with both the Bankruptcy Court and the District Court that res judicata precludes Freedom's objections to Smith's use of rental income to pay its secured claim, to the valuation of the Property, and to the plan's stepped-up payment schedule. And, while the District Court should not have held that feasibility was barred by res judicata, we conclude that the Bankruptcy Court did not clearly err when it determined the Third Modified Plan to be feasible.

### A.  Res Judicata Applies

The doctrine of res judicata "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate[.]" *Montana v. United States*, 440 U.S. 147, 153 (1979). It "protect[s] against 'the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (cleaned up) (quoting *Montana*, 440 U.S. at 153-54).

Section 1327(a) of the Bankruptcy Code effectively codifies the res judicata doctrine as it relates to confirmed

bankruptcy plans: "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." According to a leading treatise, "[t]he purpose of section 1327(a) is the same as the purpose served by the general doctrine of *res judicata*." 8 Collier on Bankruptcy ¶ 1327.02[1] (16th ed. 2023). "There must be finality to a confirmation order so that all parties may rely upon it without concern that actions that they may later take could be upset because of a later change or revocation of the order."[14] *Id.*

Accordingly, "[c]onfirmation has preclusive effect, foreclosing relitigation of 'any issue actually litigated by the parties and any issue necessarily determined by the confirmation order.'" *Bullard v. Blue Hills Bank*, 575 U.S.

---

[14] The protection provided by res judicata is of high importance in the bankruptcy context:

> It would hardly serve the purposes for which the federal bankruptcy laws were intended to permit a dissatisfied creditor to withhold its opinion of the practicality and fairness of a debtor's plan until after that plan has been completed. At such a late point in time, a meaningful modification of the plan is difficult, if not impossible, and the objecting creditor is in a position to circumvent the protective shield provided debtors under chapter 13.

8 Collier on Bankruptcy ¶ 1327.02[1] (16th ed. 2023) (quoting *In re Gregory*, 19 B.R. 668, 670 (B.A.P. 9th Cir. 1982), *aff'd*, 705 F.2d 1118 (9th Cir. 1983)).

496, 502 (2015) (quoting 8 Collier on Bankruptcy ¶ 1327.02[1][c]). Further, confirmation "bars all challenges to the plan that *could* have been raised." *In re Arctic Glacier Int'l, Inc.*, 901 F.3d 162, 166 (3d Cir. 2018), *as amended* (Oct. 24, 2018) (emphasis added); *In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989) ("Under § 1327, a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation.").

Notwithstanding a confirmed plan being res judicata, § 1329(a) of the Bankruptcy Code allows a debtor to modify a confirmed plan, subject to judicial approval, in four ways: first, to increase or reduce the amount of payments on claims of a particular class; second, to extend or reduce the time for making payments; third, to alter the payment amount to a creditor to account for payment made to that creditor outside of the confirmed plan; and fourth, subject to certain requirements, to reduce plan payments by the actual amount expended by the debtor to purchase health insurance for the debtor and any of the debtor's dependents. In addition, under § 1329(d) and, as noted earlier, Congress granted debtors the opportunity to modify their plans if the COVID-19 pandemic had caused them material financial hardship. § 1329(d) (repealed 2022). Thus, reading § 1327(a) and § 1329 together, a confirmed plan is res judicata except for when the debtor seeks to modify a plan in one or more of the ways set forth in § 1329(a), or when, under § 1329(d), the debtor experienced a material financial hardship caused by the COVID-19 pandemic. *Cf. Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (explaining, in an age discrimination case, that the common law rules of claim and issue preclusion "will apply except when a statutory purpose to the contrary is evident" (internal quotation marks omitted)).

16

Modifications under § 1329(a) or § 1329(d) are subject to many of the requirements that the Bankruptcy Code places on a debtor's original bankruptcy plan.[15]  § 1329(b)(1); § 1329(d)(3) (repealed).  And, if a modified plan is confirmed, it "becomes the [operative] plan[.]"  § 1329(b)(2).  Thus, "[o]nce the plan is modified, it is binding on the parties under section 1327(a)[.]"  8 Collier on Bankruptcy ¶ 1329.06 (16th ed. 2023).  That includes conclusively determining whether the modified plan complies with the Bankruptcy Code.  *Id.* ¶ 1327.02[1][c] ("It is quite clear that the binding effect of a chapter 13 plan extends to any issue actually litigated by the parties and any issue necessarily determined by the confirmation order, *including whether the plan complies with … the Bankruptcy Code*." (emphasis added)).

The question in this case is whether res judicata applies to a confirmed plan when the debtor properly seeks to modify plan terms under § 1329.[16]  Freedom argues that, once a plan is modified, all of the components of the plan are open to

---

[15] A modification should be approved only if it satisfies §§ 1322(a), 1322(b), 1323(c), and 1325(a), which require a Chapter 13 bankruptcy plan to meet various requirements prior to confirmation.  § 1329(b)(1); § 1329(d)(3) (repealed 2022).

[16] Smith requested to modify her plan under § 1329(d).  Because the res judicata principles we analyze spring from case law involving modifications under § 1329(a), and because Freedom argues that § 1329(a) enforces its arguments, we necessarily discuss that subsection.  Moreover, the principles we set forth in this case will remain applicable in this Circuit to future cases that concern modifications under § 1329(a).

17

challenge. In other words, Freedom says that all of the terms of Smith's plan can be reconsidered when she asks to modify the plan under § 1329. As Freedom sees it, "[c]onsiderations of finality and reliance … are absent" because Smith "abandoned the prior confirmed plans and filed a Third Modified Plan[.]" (Opening Br. at 13.)

Freedom contends that *In re Conrad* supports its position. 604 B.R. 163 (Bankr. M.D. Pa. 2019). The bankruptcy court in that case was tasked with determining whether § 1327(a) invokes res judicata "*in full*," even preventing a change under § 1329(a), "in the absence of a demonstrated change in circumstance."[17] *Id.* at 170 (emphasis added). Relying on the harmonious-reading canon,[18] the bankruptcy court concluded that "the plain and unambiguous

---

[17] We do not weigh in here on the circuit split regarding whether a court must find a change in the debtor's circumstances before allowing a modification under § 1329(a). *Compare In re Murphy*, 474 F.3d 143, 150 (4th Cir. 2007) (requiring a "substantial and unanticipated change in [debtor's] post-confirmation financial condition" before a modification will be granted), *with In re Guillen*, 972 F.3d 1221, 1228 (11th Cir. 2020) (holding that no change is required), *In re Meza*, 467 F.3d 874, 877-78 (5th Cir. 2006) (same), *Barbosa v. Solomon*, 235 F.3d 31, 41 (1st Cir. 2000) (same), *and In re Witkowski*, 16 F.3d 739, 746 (7th Cir. 1994) (same).

[18] *See United States v. Bass*, 404 U.S. 336, 344 (1971) (recognizing that "courts should interpret a statute with an eye to the surrounding statutory landscape and an ear for harmonizing potentially discordant provisions").

language of § 1329 … clearly demonstrates that the common law doctrine of *res judicata* does not apply to modifications." *Id.* at 175.

Based on that, Freedom asserts that res judicata does not apply to any terms of a post-confirmation modified plan. But it misreads *In re Conrad*'s holding. The court held that res judicata does not apply to "post-confirmation modification[s] sought pursuant to § 1329(a)." *Id.* at 173. It did not hold that res judicata is inapplicable to the *other* terms of the debtor's previously confirmed plan. *See id.* at 173, 175.

Moreover, *In re Conrad* is a single bankruptcy court decision. Other bankruptcy courts have found that a confirmed plan is a res judicata bar "to issues related to the confirmed plan that are *unrelated* to a proposed modification." *In re Loden*, 572 B.R. 211, 219 (Bankr. W.D. Ark. 2017) (emphasis added). For example, in *Massachusetts Housing Finance Agency v. Evora*, a creditor argued that the unmodified amount of its secured claim needed to be revalued after the debtors sought to modify the payment terms under § 1329(a). 255 B.R. 336, 340-41 (D. Mass. 2000). The court was unpersuaded, reasoning that "[t]here is nothing in the Bankruptcy Code nor case law to suggest that the [creditor]'s secured claim must be, or for that matter can be, redetermined[,]" that "section 1327 binds the [creditor] to the amount allowed in the confirmed [p]lan[,]" and that "[t]he [Bankruptcy] Code does not provide a second bite at the apple." *Id.* at 343.

We agree with that reasoning. Allowing all the terms of a previously confirmed plan to be reconsidered during a modification proceeding would be "inconsistent with the general policy favoring the finality of confirmed plans[.]" *In*

19

*re Szostek*, 886 F.2d at 1414. If Freedom's position were to prevail, then overdue objections could be shoehorned into the confirmation proceedings, even though unrelated to a debtor's proposed modification. Such a result would violate § 1327(a).

> The binding effect of the plan should … bar creditors from raising, at the time of a motion for modification of the plan, issues that could have been raised at the time the plan was originally confirmed. If the word "bind" in section 1327(a) is to have any meaning, it cannot be the case that any provision of the plan may be challenged at a later date.

8 Collier on Bankruptcy ¶ 1327.02[1][c] (16th ed. 2023).

Accordingly, we hold that res judicata prevents creditors from challenging the terms of a previously confirmed bankruptcy plan, except for those terms that the debtor seeks to modify under § 1329 of the Bankruptcy Code. Thus, Freedom is barred from raising any challenges to Smith's Third Modified Plan that could have been raised when the Bankruptcy Court confirmed Smith's First and Second Modified Plans. With that foundation, and as discussed more fully herein, we conclude that res judicata precludes Freedom's objections to Smith's Third Modified Plan as to use of the Property's assigned rents to pay Freedom's secured claim, to the valuation of the Property, and to the plan's stepped-up payment schedule.

## 1.      Rental Income Issue

The applicability of res judicata settles the argument over *In re Jason Realty*.  In that case, we held that rents were "unavailable for use, allocation or utilization" in the debtor's proposed bankruptcy plan because of an absolute assignment agreement on the property in question.  59 F.3d at 431.  Bankruptcy courts in our Circuit have since disagreed about the proper application of the precedent as it relates to paying down secured claims.  In *In re Parks*, the bankruptcy court held that a debtor could pay down a secured claim using a property's rents, notwithstanding that the creditor had legal title to the rents.  No. 12-13045, 2012 WL 3561738, at *3 (Bankr. D.N.J. Aug. 16, 2012).  In contrast, in *In re Surma*, the court held that a creditor was not required to use rents received from the debtor's property to reduce a secured claim.  504 B.R. 770, 774 (Bankr. D.N.J. 2014).  We need not decide whether or how *In re Jason Realty* applies in this case, however, because Freedom consented to the *In re Parks* approach via the Consent Order.

The Consent Order stated that "all rental payments that are held by [Smith] … shall be immediately paid to the Chapter 13 Trustee" and that "[o]n a go forward basis, [Smith] shall tender all rental payments to the Chapter 13 Trustee." (App. at 121.)  Freedom does not dispute that, by consenting to have the rents go directly to the Trustee, it agreed that the Property's rents would reduce its secured claim.  But it argues that "there can be no issue preclusion where [Freedom] never consented to the Third Modified Plan and there is nothing in the [C]onsent [O]rder resolving the objection to the First Modified Plan that bars [Freedom]'s objection to [Smith] using or allocating the assigned rents to fund the Third Modified Plan." (Opening Br. at 21.)  Thus, once again, Freedom's position is that the Third

21

Modified Plan is a new plan and that the Consent Order should have no impact on it.

That position is inconsistent with the res judicata principles just discussed. The parties resolved Freedom's use-of-rents objection when they agreed to the *In re Parks* approach in the Consent Order. Accordingly, the District Court correctly concluded that Freedom's objection about the use of the rental income is foreclosed by res judicata.

## 2. Valuation Issue

Freedom argues that the Property's value should have been re-evaluated before confirmation of the Third Modified Plan. It relies on § 506(a)(1), which provides, in relevant part, that the value of property used as collateral "shall be determined … in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." That, says Freedom, means "[t]he pertinent date for valuation purposes is in conjunction with the confirmation hearing on the Third Modified Plan[.]" (Opening Br. at 24.)

Once again, Freedom's objection is barred by res judicata. "[A] creditor may not after confirmation assert … that the plan should give a higher valuation to a particular property[.]" 8 Collier on Bankruptcy ¶ 1327.02[1][c] (16th ed. 2023); *see also Evora*, 255 B.R. at 343 ("While section 1329(a)(1) provides that a plan may be modified to increase or reduce the amount of payments[,] it does not state that the plan may be modified to increase or reduce the amount of the secured claim.").

22

The cramdown value of the Property was listed as $95,000 in Smith's First Modified Plan. Freedom agreed to that value at a confirmation hearing. At the hearing, Freedom specifically told the bankruptcy court that it was not disputing the $95,000 valuation. And, in the subsequent Consent Order, the parties agreed that "[t]he Property has a fair market value of $95,000." (App. at 120.) Accordingly, Freedom has no basis to complain about the property's valuation now.

### 3.      Unequal Payments Issue

So too for Freedom's complaints about unequal payments. The Bankruptcy Code states that any periodic payments under a Chapter 13 bankruptcy plan are to "be in equal monthly amounts[.]" § 1325(a)(5)(B)(iii)(I). Freedom argues that the Third Modified Plan's step-up payment schedule violates that provision. But it did not raise that objection to Smith's Second Modified Plan, which included a step-up payment schedule. Freedom tries to evade that inconvenient fact by asserting that bankruptcy courts have a statutory duty to ensure that a modified plan complies with the Bankruptcy Code, even if a creditor does not raise an objection. The principles that the Supreme Court set forth in *United Student Aid Funds, Inc. v. Espinosa* prompt us to reject Freedom's argument. 559 U.S. 260 (2010).

In *Espinosa*, a creditor "filed a motion under Federal Rule of Civil Procedure 60(b)(4) asking the Bankruptcy Court to rule that its order confirming the plan was void because the order was issued in violation of the [Bankruptcy] Code[.]" *Id.* at 264. The creditor asserted that the confirmation discharged a portion of student loan debt even though the bankruptcy court did not first find undue hardship, which it was required to do.

23

*Id.* at 263-65. Nevertheless, the Supreme Court upheld the Bankruptcy Court's confirmation, reasoning that "Rule 60(b)(4) strikes a balance between the need for finality of judgments and the importance of ensuring that litigants have a full and fair opportunity to litigate a dispute." *Id.* at 276. Because the creditor in *Espinosa* had actual notice of the plan and its contents, the creditor could not "sleep on [its] rights." *Id.* at 275.

The Supreme Court explained that § 1325(a) "instructs a bankruptcy court to confirm a plan only if the court finds, *inter alia*, that the plan complies with the applicable provisions of the [Bankruptcy] Code." *Id.* at 277 (internal quotation marks omitted). That is beyond dispute. "[T]he [Bankruptcy] Code makes plain that bankruptcy courts have the authority – indeed, the obligation – to direct a debtor to conform his plan to the requirements" of the Bankruptcy Code. *Id.* Thus, it is a "step too far" for a Bankruptcy Court to approve a plan "despite its failure to comply with the [Bankruptcy] Code[,]" only because there was no objection from a creditor. *Id.* at 276. Nevertheless, as the *Espinosa* Court went on to explain, when "a party is notified of a plan's contents and fails to object to confirmation of the plan before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate[.]" *Id.*

*Espinosa*'s principles, although stated in the context of a Rule 60(b)(4) dispute, are applicable here because the plan modification context involves the same kind of finality concerns. Finality is so critical in a bankruptcy proceeding that we have called confirmation's preclusive effect "a principle that anchors bankruptcy law[.]" *In re Arctic Glacier*, 901 F.3d at 166. Allowing a creditor to object to previously uncontested

24

terms would inhibit a debtor's ability to rely on and expeditiously complete her plan. In fact, finality's powerful importance to bankruptcy confirmation and modification is evident from Congress's choice to codify the res judicata doctrine in § 1327(a).

Applying *Espinosa*'s principles is consistent with our own precedent favoring finality over a plan's compliance with the Bankruptcy Code. In *In re Szostek*, we were "faced … with a clash between two seemingly divergent policies involved in the Bankruptcy Code[,] … the policy of finality, as evidenced by § 1327, … [and] § 1325(a)[,] which provides that a court shall confirm a plan which meets the conditions listed in that section." 886 F.2d at 1408. We explained that, "[w]hile we do not understate the importance of the obligation of the bankruptcy court … to determine that a plan complies with the … Bankruptcy Code prior to" plan confirmation, "we nonetheless recognize that the affirmative obligation to object to the [debtor's] plan rested with [the creditor], not with the bankruptcy court[.]" *Id.* at 1414. For that reason, we concluded that, "after [a] plan is confirmed the policy favoring the finality of confirmation is stronger than the bankruptcy court's … obligations to verify a plan's compliance with the [Bankruptcy] Code." *Id.* at 1406.

Here, Smith included a stepped-up payment plan in the Second Modified Plan. Freedom was on notice of the provisions of that plan.[19] Having received such notice,

---

[19] The Second Modified Plan's Certificate of Notice shows that Freedom was sent notice by first class mail on

25

Freedom was "obligated to take an active role in protecting [its] claim[]." *Id.* at 1414. Yet, it did not object to the Second Modified Plan. The Bankruptcy Court confirmed the plan, stating that "it appear[ed] that the applicable provisions of the Bankruptcy Code ha[d] been complied with[.]" (Supp. App. at 26.) Thus, the Court did not confirm the plan only because there was no objection from a creditor. Whether the Bankruptcy Court was correct in its ruling is not what matters at this juncture. Freedom's objection is barred by res judicata, even if such a payment plan violated the Bankruptcy Code.[20]

## B.    Feasibility

Before a bankruptcy court confirms a Chapter 13 plan, the feasibility requirement stated in § 1325(a)(6) requires the court to determine whether "the debtor will be able to make all payments under the plan and to comply with the plan[.]" Freedom argues that the Third Modified Plan is not feasible and, thus, should not have been confirmed. The District Court concluded that Freedom's feasibility argument was barred by

June 17, 2020. Freedom does not dispute that it received such notice.

[20]    The parties dispute whether the scope of § 1325(a)(5)(B)(iii)(I) extends to rental property or to stepped-up payment plans that do not have a balloon payment at the end of the plan's term. We do not reach the issue of whether Smith's stepped-up payment plan violates § 1325(a)(5)(B)(iii)(I) or any other provision of the Bankruptcy Code. For today's purposes, it is sufficient to say that Freedom's unequal payment objection is foreclosed by res judicata.

26

res judicata. But, as the parties agree, Smith's modifications to the payment schedule in the Third Modified Plan required feasibility to be considered anew. Otherwise, bankruptcy courts could not deny proposed modifications, like the change to the payment schedule in this case, that would make a plan infeasible but would otherwise comply with the Bankruptcy Code.[21] We will therefore address the merits of Freedom's feasibility argument, after setting forth the applicable standard of review.

## 1.    Standard of Review

We have not written precedentially on the appropriate standard of review for a feasibility determination. The District Court said that a feasibility determination is reviewed for abuse of discretion.[22] Feasibility, however, is a question of fact and must be reviewed for clear error.

"Facts include past events, but they are not restricted to historical events." *Kaplun v. Att'y Gen.*, 602 F.3d 260, 269 (3d Cir. 2010). "A finding of fact may also stem from an assessment of what is expected to occur in the future[,]" *id.*, so "an assessment of the probability of a future event should generally be categorized as a finding of fact," *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 852 F.3d 268, 289 (3d Cir. 2017), *vacated and remanded on other grounds sub*

---

[21] Freedom objected to the feasibility of the First Modified Plan, but those objections were resolved in the Consent Order.

[22] The District Court did not cite to any authority when it stated the standard of review was for abuse of discretion.

*nom. Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299 (2019). "Of course, to call a likelihood 'fact' is not to say that the likely outcome will necessarily occur, but the likelihood itself remains a factual finding that can be made *ex ante* the actual outcome." *Kaplun*, 602 F.3d at 269-70.

A feasibility determination is a prototypical example of a forward-looking factual finding. The bankruptcy court must forecast whether the debtor will make all plan payments over the duration of the plan's term. Thus, a bankruptcy court's feasibility determination is a question of fact to be reviewed for clear error. In so holding, we join several of our sister circuits that have said as much when considering the appropriate standard of review of a feasibility determination. *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 106 (2d Cir. 2011); *In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168, 172 (5th Cir. 2011); *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1985); *In re Gentry*, 807 F.3d 1222, 1225 (10th Cir. 2015). *But see In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d 637, 647 (9th Cir. 2017), *as amended* (June 23, 2017) ("A bankruptcy court's finding of feasibility is reviewed for abuse of discretion.").

## 2. Application of Clear Error Standard

Freedom argues that the Bankruptcy Court's remarks during the Third Modified Plan's confirmation hearing, including "who knows what's going to happen with the rent[,]" "I have no idea when the eviction moratorium is going to be lifted[,]" and "I didn't do the math," (App. at 12-13), "show that there was [] no serious analysis or evidence upon which a factual determination of feasibility was made." (Opening Br. at 28-29.)

Although the Bankruptcy Court acknowledged the uncertainty of the impact of COVID-19 in the future when it made those statements, it did not clearly err in determining that Smith would be able to meet her payment obligations under the Third Modified Plan. The Court analyzed Smith's bankruptcy petition, which showed that she had a monthly income of $6,164 and monthly expenses of $4,111, leaving an excess of $2,053. Because the Third Modified Plan called for payments of $1,500 per month for eight months, and then $2,010 per month for the remaining fifty-seven months, the Court calculated that Smith would have sufficient income, after expenses, to make the payments. So, the Bankruptcy Court did do the math.[23] Furthermore, it verified with the bankruptcy trustee that Smith was current with all of her existing obligations under the bankruptcy plan.

For those reasons, the Bankruptcy Court's factual finding that the Third Modified Plan was feasible was not "completely devoid of a credible evidentiary basis[,]" and certainly had a "rational relationship to the supporting data." *Shire US Inc. v. Barr Lab'ys Inc.*, 329 F.3d 348, 352 (3d Cir. 2003). In short, the Bankruptcy Court did not clearly err in its feasibility determination.

---

[23] The Bankruptcy Judge's statement, "I didn't do the math," was not in regard to Smith's ability to make plan payments but was rather about Freedom receiving the present value of the Property over the term of the Third Modified Plan. (App. at 13.)

29

**III.   CONCLUSION**

For the foregoing reasons, we will affirm the District Court's affirmance of the Bankruptcy Court's order that confirmed Smith's Third Modified Plan.